(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GARZA *v.* IDAHO

### CERTIORARI TO THE SUPREME COURT OF IDAHO

No. 17–1026.  Argued October 30, 2018—Decided February 27, 2019

Petitioner Gilberto Garza, Jr., signed two plea agreements, each arising from state criminal charges and each containing a clause stating that Garza waived his right to appeal.  Shortly after sentencing, Garza told his trial counsel that he wished to appeal.  Instead of filing a notice of appeal, counsel informed Garza that an appeal would be "problematic" given Garza's appeal waiver.  After the time period for Garza to preserve an appeal lapsed, he sought state postconviction relief, alleging that his trial counsel had rendered ineffective assistance by failing to file a notice of appeal despite his repeated requests.  The Idaho trial court denied relief, and the Idaho Court of Appeals affirmed.  Also affirming, the Idaho Supreme Court held that Garza could not show the requisite deficient performance by counsel and resulting prejudice.  In doing so, the court concluded that the presumption of prejudice recognized in *Roe* v. *Flores-Ortega*, 528 U. S. 470, when trial counsel fails to file an appeal as instructed does not apply when the defendant has agreed to an appeal waiver.

*Held*: *Flores-Ortega*'s presumption of prejudice applies regardless of whether a defendant has signed an appeal waiver. Pp. 3–14.

   (a) Under *Strickland* v. *Washington*, 466 U. S. 668, a defendant who claims ineffective assistance of counsel must prove (1) "that counsel's representation fell below an objective standard of reasonableness," *id.*, at 687–688, and (2) that any such deficiency was "prejudicial to the defense," *id.,* at 692.  However, "prejudice is presumed" in "certain Sixth Amendment contexts," *ibid.,* such as "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken," *Flores-Ortega*, 528 U. S., at 484.  Pp. 3–4.

   (b) This case hinges on two procedural devices: appeal waivers and notices of appeal.  No appeal waiver serves as an absolute bar to all

appellate claims.  Because a plea agreement is essentially a contract, it does not bar claims outside its scope.  And, like any contract, the language of appeal waivers can vary widely, leaving many types of claims unwaived.  A waived appellate claim may also proceed if the prosecution forfeits or waives the waiver or if the Government breaches the agreement.  Separately, some claims are treated as unwaiveable.  Most fundamentally, courts agree that defendants retain the right to challenge whether the waiver itself was knowing and voluntary.

The filing of a notice of appeal is "a purely ministerial task that imposes no great burden on counsel."  *Flores-Ortega*, 528 U. S., at 474.  Filing requirements reflect that appellate claims are likely to be ill defined or unknown at the filing stage.  And within the division of labor between defendants and their attorneys, the "ultimate authority" to decide whether to "take an appeal" belongs to the accused. *Jones* v. *Barnes*, 463 U. S. 745, 751.  Pp. 4–7.

(c) Garza's attorney rendered deficient performance by not filing a notice of appeal in light of Garza's clear requests.  Given the possibility that a defendant will end up raising claims beyond an appeal waiver's scope, simply filing a notice of appeal does not necessarily breach a plea agreement.  Thus, counsel's choice to override Garza's instructions was not a strategic one.  In any event, the bare decision whether to appeal is ultimately the defendant's to make.  Pp. 7–8.

(d) Because there is no dispute that Garza wished to appeal, a direct application of *Flores-Ortega*'s language resolves this case.  *Flores-Ortega* reasoned that because a presumption of prejudice applies whenever "'the accused is denied counsel at a critical stage,'" it makes greater sense to presume prejudice when counsel's deficiency forfeits an "appellate proceeding altogether."  528 U. S., at 483.  Because Garza retained a right to appeal at least some issues despite his waivers, he had a right to a proceeding and was denied that proceeding altogether as a result of counsel's deficient performance. That he surrendered many claims by signing appeal waivers does not change things.  First, the presumption of prejudice does not bend because a particular defendant seems to have had poor prospects.  See, *e.g.*, *Jae Lee* v. *United States*, 582 U. S. ___, ___.  Second, while the defendant in *Flores-Ortega* did not sign an appeal waiver, he did plead guilty, which "reduces the scope of potentially appealable issues" on its own.  528 U. S., at 480.  Pp. 8–10.

(e) Contrary to the argument by Idaho and the U. S. Government, as *amicus*, that Garza never "had a right" to his appeal and thus that any deficient performance by counsel could not have caused the loss of any such appeal, Garza did retain a right to his appeal; he simply had fewer possible claims than some other appellants.  The Govern-

Syllabus

ment also proposes a rule that would require a defendant to show—on a case-by-case basis—that he would have presented claims that would have been considered by the appellate court on the merits. This Court, however, has already rejected attempts to condition the restoration of a defendant's appellate rights forfeited by ineffective counsel on proof that the defendant's appeal had merit. See, *e.g.*, *Rodriquez* v. *United States*, 395 U. S. 327, 330. Moreover, it is not the defendant's role to decide what arguments to press, making it especially improper to impose that role upon the defendant simply because his opportunity to appeal was relinquished by deficient counsel. And because there is no right to counsel in postconviction proceedings and, thus, most applicants proceed *pro se*, the Government's proposal would be unfair, ill advised, and unworkable. Pp. 10–14.

162 Idaho 791, 405 P. 3d 576, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, KAGAN, and KAVANAUGH, JJ., joined. THOMAS, J., filed a dissenting opinion, in which GORSUCH, J., joined, and in which ALITO, J., joined as to Parts I and II.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

―――――

No. 17–1026

―――――

## GILBERTO GARZA, JR., PETITIONER *v.* IDAHO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF IDAHO

[February 27, 2019]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In *Roe* v. *Flores-Ortega*, 528 U. S. 470 (2000), this Court held that when an attorney's deficient performance costs a defendant an appeal that the defendant would have otherwise pursued, prejudice to the defendant should be presumed "with no further showing from the defendant of the merits of his underlying claims." *Id.,* at 484. This case asks whether that rule applies even when the defendant has, in the course of pleading guilty, signed what is often called an "appeal waiver"—that is, an agreement forgoing certain, but not all, possible appellate claims. We hold that the presumption of prejudice recognized in *Flores-Ortega* applies regardless of whether the defendant has signed an appeal waiver.

I

In early 2015, petitioner Gilberto Garza, Jr., signed two plea agreements, each arising from criminal charges brought by the State of Idaho. Each agreement included a clause stating that Garza "waive[d] his right to appeal." App. to Pet. for Cert. 44a, 49a. The Idaho trial court accepted the agreements and sentenced Garza to terms of prison in accordance with the agreements.

Shortly after sentencing, Garza told his trial counsel

that he wished to appeal.[1]  In the days that followed, he would later attest, Garza "continuously reminded" his attorney of this directive "via phone calls and letters," Record 210, and Garza's trial counsel acknowledged in his own affidavit that Garza had "told me he wanted to appeal the sentence(s) of the court," *id.,* at 151.[2]  Garza's trial counsel, however, did not file a notice of appeal.  Instead, counsel "informed Mr. Garza that an appeal was problematic because he waived his right to appeal." *Ibid.*  The period of time for Garza's appeal to be preserved came and went with no notice having been filed on Garza's behalf.

Roughly four months after sentencing, Garza sought postconviction relief in Idaho state court.  As relevant here, Garza alleged that his trial counsel rendered ineffective assistance by failing to file notices of appeal despite Garza's requests.  The Idaho trial court denied relief, and both the Idaho Court of Appeals and the Idaho Supreme Court affirmed that decision.  See 162 Idaho 791, 793, 405 P. 3d 576, 578 (2017).  The Idaho Supreme Court ruled that Garza, given the appeal waivers, needed to show both deficient performance and resulting prejudice; it concluded that he could not.  See *id.,* at 798, 405 P. 3d, at 583.

In ruling that Garza needed to show prejudice, the Idaho Supreme Court acknowledged that it was aligning itself with the minority position among courts.  For exam-

——————

[1] The record suggests that Garza may have been confused as to whether he had waived his appellate rights in the first place.  See Record 97 (answering "No" on a court advisory form asking whether Garza had "waived [his] right to appeal [his] judgment of conviction and sentence as part of [his] plea agreement"); see also *id.,* at 118, 121, 132 (showing that Garza's sentencing judge and judgments of conviction provided, despite the appeal waiver, generalized notice of a "right to appeal").  Because our ruling does not turn on these facts, we do not address them further.

[2] Garza's affidavit states that he wished to argue, at least in part, that he "was persuaded to plead guilty by [the] prosecuting attorney and [his] counsel which was not voluntarily [*sic*]." *Id.,* at 210.

ple, 8 of the 10 Federal Courts of Appeals to have considered the question have applied *Flores-Ortega*'s presumption of prejudice even when a defendant has signed an appeal waiver.[3]  162 Idaho*,* at 795, 405 P. 3d, at 580.

We granted certiorari to resolve the split of authority. 585 U. S. \_\_\_ (2018).  We now reverse.

## II
## A

The Sixth Amendment guarantees criminal defendants "the right . . . to have the Assistance of Counsel for [their] defence."  The right to counsel includes "'the right to the effective assistance of counsel.'"  *Strickland* v. *Washington*, 466 U. S. 668, 686 (1984) (quoting *McMann* v. *Richardson*, 397 U. S. 759, 771, n. 14 (1970)).  Under *Strickland*, a defendant who claims ineffective assistance of counsel must prove (1) "that counsel's representation fell below an objective standard of reasonableness," 466 U. S.*,* at 687–688, and (2) that any such deficiency was "prejudicial to the defense," *id.,* at 692.

"In certain Sixth Amendment contexts," however, "prejudice is presumed."  *Ibid.*  For example, no showing of prejudice is necessary "if the accused is denied counsel at a critical stage of his trial," *United States* v. *Cronic*, 466

_____

[3] Compare *Campbell* v. *United States*, 686 F. 3d 353, 359 (CA6 2012); *Watson* v. *United States*, 493 F. 3d 960, 964 (CA8 2007); *United States* v. *Poindexter*, 492 F. 3d 263, 273 (CA4 2007); *United States* v. *Tapp*, 491 F. 3d 263, 266 (CA5 2007); *Campusano* v. *United States*, 442 F. 3d 770, 775 (CA2 2006); *Gomez-Diaz* v. *United States*, 433 F. 3d 788, 791–794 (CA11 2005); *United States* v. *Sandoval-Lopez*, 409 F. 3d 1193, 1195–1199 (CA9 2005); *United States* v. *Garrett*, 402 F. 3d 1262, 1266–1267 (CA10 2005), with *Nunez* v. *United States*, 546 F. 3d 450, 455 (CA7 2008); *United States* v. *Mabry*, 536 F. 3d 231, 241 (CA3 2008).  At least two state courts have declined to apply *Flores-Ortega* in the face of appeal waivers.  See *Buettner* v. *State*, 382 Mont. 410, 363 P. 3d 1147 (2015) (Table); *Stewart* v. *United States*, 37 A. 3d 870, 877 (D. C. 2012); see also *Kargus* v. *State*, 284 Kan. 908, 922, 928, 169 P. 3d 307, 316, 320 (2007).

U. S. 648, 659 (1984), or left "entirely without the assistance of counsel on appeal," *Penson* v. *Ohio*, 488 U. S. 75, 88 (1988). Similarly, prejudice is presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U. S., at 659. And, most relevant here, prejudice is presumed "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken." *Flores-Ortega*, 528 U. S., at 484. We hold today that this final presumption applies even when the defendant has signed an appeal waiver.

## B

It is helpful, in analyzing Garza's case, to first address two procedural devices on which the case hinges: appeal waivers and notices of appeal.

### 1

We begin with the term "appeal waivers." While the term is useful shorthand for clauses like those in Garza's plea agreements, it can misleadingly suggest a monolithic end to all appellate rights.[4] In fact, however, no appeal waiver serves as an absolute bar to all appellate claims.

As courts widely agree, "[a] valid and enforceable appeal waiver . . . only precludes challenges that fall within its scope." *United States* v. *Hardman*, 778 F. 3d 896, 899 (CA11 2014); see also *ibid.,* n. 2 (collecting cases from the

––––––––––

[4] While this Court has never recognized a "constitutional right to an appeal," it has "held that if an appeal is open to those who can pay for it, an appeal must be provided for an indigent." *Jones* v. *Barnes*, 463 U. S. 745, 751 (1983); see also *Douglas* v. *California,* 372 U. S. 353 (1963); *Griffin* v. *Illinois,* 351 U. S. 12, 18 (1956) (plurality opinion). Today, criminal defendants in nearly all States have a right to appeal either by statute or by court rule. See generally Robertson, The Right To Appeal, 91 N. C. L. Rev. 1219, 1222, and n. 8 (2013). Criminal defendants in federal court have appellate rights under 18 U. S. C. §3742(a) and 28 U. S. C. §1291.

11 other Federal Courts of Appeals with criminal jurisdiction); *State* v. *Patton*, 287 Kan. 200, 228–229, 195 P. 3d 753, 771 (2008).  That an appeal waiver does not bar claims outside its scope follows from the fact that, "[a]lthough the analogy may not hold in all respects, plea bargains are essentially contracts."  *Puckett* v. *United States*, 556 U. S. 129, 137 (2009).

As with any type of contract, the language of appeal waivers can vary widely, with some waiver clauses leaving many types of claims unwaived.[5]  Additionally, even a waived appellate claim can still go forward if the prosecution forfeits or waives the waiver.  *E.g., United States* v. *Story*, 439 F. 3d 226, 231 (CA5 2006).  Accordingly, a defendant who has signed an appeal waiver does not, in directing counsel to file a notice of appeal, necessarily undertake a quixotic or frivolous quest.

Separately, all jurisdictions appear to treat at least some claims as unwaiveable.  Most fundamentally, courts agree that defendants retain the right to challenge whether the waiver itself is valid and enforceable—for example, on the grounds that it was unknowing or involuntary.[6]  Conse-

————————

[5] See generally Brief for Idaho Association of Criminal Defense Lawyers et al. as *Amici Curiae* 6–10 (collecting examples of appeal waivers that allowed challenges to the defendant's sentence or conviction or allowed claims based on prosecutorial misconduct or changes in law).

[6] See, *e.g., United States* v. *Brown*, 892 F. 3d 385, 394 (CADC 2018) ("Like all other courts of appeals, our circuit holds that a defendant 'may waive his right to appeal his sentence as long as his decision is knowing, intelligent, and voluntary'"); *Spann* v. *State*, 704 N. W. 2d 486, 491 (Minn. 2005) ("Jurisdictions allowing a defendant to waive his or her right to appeal a conviction require that the waiver be made 'intelligently, voluntarily, and with an understanding of the consequences'").  Lower courts have also applied exceptions for other kinds of claims, including "claims that a sentence is based on race discrimination, exceeds the statutory maximum authorized, or is the product of ineffective assistance of counsel."  King & O'Neill, Appeal Waivers and the Future of Sentencing Policy, 55 Duke L. J. 209, 224 (2005) (collecting federal cases); see also, *e.g., United States* v. *Puentes-Hurtado*, 794

quently, while signing an appeal waiver means giving up some, many, or even most appellate claims, some claims nevertheless remain.

2

It is also important to consider what it means—and does not mean—for trial counsel to file a notice of appeal.

"Filing such a notice is a purely ministerial task that imposes no great burden on counsel." *Flores-Ortega*, 528 U. S., at 474. It typically takes place during a compressed window: 42 days in Idaho, for example, and just 14 days in federal court. See Idaho Rule App. Proc. 14(a) (2017); Fed. Rule App. Proc. 4(b)(1)(A). By the time this window has closed, the defendant likely will not yet have important documents from the trial court, such as transcripts of key proceedings, see, *e.g.,* Idaho Rules App. Proc. 19 and 25; Fed. Rule App. Proc. 10(b), and may well be in custody, making communication with counsel difficult, see *Peguero* v. *United States*, 526 U. S. 23, 26 (1999). And because some defendants receive new counsel for their appeals, the lawyer responsible for deciding which appellate claims to raise may not yet even be involved in the case.

Filing requirements reflect that claims are, accordingly, likely to be ill defined or unknown at this stage. In the federal system, for example, a notice of appeal need only identify who is appealing; what "judgment, order, or part thereof" is being appealed; and "the court to which the appeal is taken." Fed. Rule App. Proc. 3(c)(1). Generally speaking, state requirements are similarly

F. 3d 1278, 1284 (CA11 2015) ("[A]ppellate review is also permitted when a defendant claims that the government breached the very plea agreement which purports to bar him from appealing or collaterally attacking his conviction and sentence"); *State* v. *Dye*, 291 Neb. 989, 999, 870 N. W. 2d 628, 634 (2015) (holding that appeal waivers are subject to a "miscarriage of justice" exception). We make no statement today on what particular exceptions may be required.

nonsubstantive.[7]

A notice of appeal also fits within a broader division of labor between defendants and their attorneys. While "the accused has the ultimate authority" to decide whether to "take an appeal," the choice of what specific arguments to make within that appeal belongs to appellate counsel. *Jones* v. *Barnes*, 463 U. S. 745, 751 (1983); see also *McCoy* v. *Louisiana*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 6). In other words, filing a notice of appeal is, generally speaking, a simple, nonsubstantive act that is within the defendant's prerogative.

## C

With that context in mind, we turn to the precise legal issues here. As an initial matter, we note that Garza's attorney rendered deficient performance by not filing the notice of appeal in light of Garza's clear requests. As this Court explained in *Flores-Ortega*:

> "We have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes." 528 U. S., at 477 (citations omitted); see also *id.,* at 478.

------

[7] *E.g.,* Miss. Rule Crim. Proc. 29.1(b) (2017); Ohio Rule App. Proc. 3(D) (Lexis 2017). While Idaho requires a notice of appeal to "contain substantially . . . [a] preliminary statement of the issues on appeal which the appellant then intends to assert in the appeal," the Rule in question also makes clear that "any such list of issues on appeal shall not prevent the appellant from asserting other issues on appeal." Idaho Rule App. Proc. 17(f ).

Idaho maintains that the risk of breaching the defendant's plea agreement renders counsel's choice to override the defendant's instructions a strategic one. See *Strickland,* 466 U. S., at 690–691 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . "). That is not so. While we do not address what constitutes a defendant's breach of an appeal waiver or any responsibility counsel may have to discuss the potential consequences of such a breach, it should be clear from the foregoing that simply filing a notice of appeal does not necessarily breach a plea agreement, given the possibility that the defendant will end up raising claims beyond the waiver's scope. And in any event, the bare decision whether to appeal is ultimately the defendant's, not counsel's, to make.[8] See *McCoy*, 584 U. S., at ___ (slip op., at 6); *Barnes*, 463 U. S., at 751. Where, as here, a defendant has expressly requested an appeal, counsel performs deficiently by disregarding the defendant's instructions.[9]

## D

We now address the crux of this case: whether *Flores-Ortega*'s presumption of prejudice applies despite an appeal waiver. The holding, principles, and facts of *Flores-*

---

[8]That does not mean, of course, that appellate counsel must then make unsupportable arguments. After an appeal has been preserved and counsel has reviewed the case, counsel may always, in keeping with longstanding precedent, "advise the court and request permission to withdraw," while filing "a brief referring to anything in the record that might arguably support the appeal." *Anders* v. *California*, 386 U. S. 738, 744 (1967). The existence of this procedure reinforces that a defendant's appellate rights should not hinge "on appointed counsel's bare assertion that he or she is of the opinion that there is no merit to the appeal." *Penson* v. *Ohio*, 488 U. S. 75, 80 (1988).

[9]We leave undisturbed today *Flores-Ortega*'s separate discussion of how to approach situations in which a defendant's wishes are less clear. See 528 U. S., at 478–481.

*Ortega* show why that presumption applies equally here.

With regard to prejudice, *Flores-Ortega* held that, to succeed in an ineffective-assistance claim in this context, a defendant need make only one showing: "that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." 528 U. S., at 484. So long as a defendant can show that "counsel's constitutionally deficient performance deprive[d him] of an appeal that he otherwise would have taken," courts are to "presum[e] prejudice with no further showing from the defendant of the merits of his underlying claims." *Ibid.* Because there is no dispute here that Garza wished to appeal, see *supra,* at 2, a direct application of *Flores-Ortega*'s language resolves this case. See 528 U. S., at 484.

*Flores-Ortega*'s reasoning shows why an appeal waiver does not complicate this straightforward application. That case, like this one, involves a lawyer who forfeited an appellate proceeding by failing to file a notice of appeal. *Id.,* at 473–475. As the Court explained, given that past precedents call for a presumption of prejudice whenever "'the accused is denied counsel at a critical stage,'" it makes even greater sense to presume prejudice when counsel's deficiency forfeits an "appellate proceeding altogether." *Id.,* at 483. After all, there is no disciplined way to "accord any 'presumption of reliability'. . . to judicial proceedings that never took place." *Ibid.* (quoting *Smith* v. *Robbins*, 528 U. S. 259, 286 (2000)).

That rationale applies just as well here because, as discussed *supra,* at 4–6, Garza retained a right to appeal at least some issues despite the waivers he signed.[10] In other words, Garza had a right to a proceeding, and he

——————

[10] Or the State might not have invoked the waiver at all. *E.g., United States* v. *Archie*, 771 F. 3d 217, 223, n. 2 (CA4 2014); *State* v. *Rendon*, 2012 WL 9492805, *1, n. 1 (Idaho Ct. App., May 11, 2012).

was denied that proceeding altogether as a result of counsel's deficient performance.

That Garza surrendered many claims by signing his appeal waivers does not change things. First, this Court has made clear that when deficient counsel causes the loss of an entire proceeding, it will not bend the presumption-of-prejudice rule simply because a particular defendant seems to have had poor prospects. See, *e.g., Jae Lee* v. *United States*, 582 U. S. ___, ___ (2017) (slip op., at 9). We hew to that principle again here.

Second, while the defendant in *Flores-Ortega* did not sign an appeal waiver, he did plead guilty, and—as the Court pointed out—"a guilty plea reduces the scope of potentially appealable issues" on its own. See 528 U. S., at 480. In other words, with regard to the defendant's appellate prospects, *Flores-Ortega* presented at most a difference of degree, not kind, and prescribed a presumption of prejudice regardless of how many appellate claims were foreclosed. See *id.,* at 484. We do no different today.

Instead, we reaffirm that, "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal," with no need for a "further showing" of his claims' merit, *ibid.,* regardless of whether the defendant has signed an appeal waiver.

## III

*Flores-Ortega* states, in one sentence, that the loss of the "entire [appellate] proceeding itself, which a defendant wanted at the time and to which he had a right, . . . demands a presumption of prejudice." *Id.,* at 483. Idaho and the U. S. Government, participating as an *amicus* on Idaho's behalf, seize on this language, asserting that Garza never "had a right" to his appeal and thus that any deficient performance by counsel could not have caused

the loss of any such appeal. See Brief for Respondent 11, 23–26; Brief for United States as *Amicus Curiae* 7, 13, 21– 22. These arguments miss the point. Garza did retain a right to his appeal; he simply had fewer possible claims than some other appellants. Especially because so much is unknown at the notice-of-appeal stage, see *supra*, at 6– 7, it is wholly speculative to say that counsel's deficiency forfeits no proceeding to which a defendant like Garza has a right.[11]

The Government also takes its causation argument one step further. Arguing that, in the appeal-waiver context, "a generalized request that an attorney file an appeal . . . is not enough to show that appellate merits review would have followed," Brief for United States as *Amicus Curiae* 22, the Government proposes a rule that would require a defendant to show—on a "case-specific" basis, *id.,* at 23— either (1) "that he in fact requested, or at least expressed interest in, an appeal on a non-waived issue," *id.,* at 21– 22, or alternatively (2) "'that there were nonfrivolous grounds for appeal' despite the waiver," *id.,* at 22 (quoting *Flores-Ortega*, 528 U. S., at 485). We decline this sugges- tion, because it cannot be squared with our precedent and would likely prove both unfair and inefficient in practice.

This Court has already rejected attempts to condition the restoration of a defendant's appellate rights forfeited by ineffective counsel on proof that the defendant's appeal had merit. In *Flores-Ortega*, the Court explained that prejudice should be presumed "with no further showing from the defendant of the merits of his underlying claims."

---

[11] The possibility that an appellate court confronted with a waived claim (and a motion to enforce the waiver) would technically "dismiss the appeal without reaching the merits," see Brief for United States as *Amicus Curiae* 17; see also Brief for Respondent 26, does not alter this conclusion. Whatever the label, the defendant loses the opportunity to raise any appellate claims at all—including those that would, or at least could, be heard on the merits.

*Id.,* at 484; see also *id.,* at 486. In *Rodriquez* v. *United States*, 395 U. S. 327 (1969), similarly, the Court rejected a rule that required a defendant whose appeal had been forfeited by counsel "to specify the points he would raise were his right to appeal reinstated." *Id.,* at 330. So too here.

Moreover, while it is the defendant's prerogative whether to appeal, it is not the defendant's role to decide what arguments to press. See *Barnes*, 463 U. S., at 751, 754. That makes it especially improper to impose that role upon the defendant simply because his opportunity to appeal was relinquished by deficient counsel. "Those whose right to appeal has been frustrated should be treated exactly like any other appellants; they should not be given an additional hurdle to clear just because their rights were violated at some earlier stage in the proceedings." *Rodriquez*, 395 U. S., at 330. We accordingly decline to place a pleading barrier between a defendant and an opportunity to appeal that he never should have lost.

Meanwhile, the Government's assumption that unwaived claims can reliably be distinguished from waived claims through case-by-case postconviction review is dubious. There is no right to counsel in postconviction proceedings, see *Pennsylvania* v. *Finley*, 481 U. S. 551, 555 (1987), and most applicants proceed *pro se*.[12] That means that the Government effectively puts its faith in asking "an indigent, perhaps *pro se*, defendant to demonstrate that his hypothetical appeal might have had merit before any advocate has ever reviewed the record in his case in search of potentially meritorious grounds for appeal," *Flores-Ortega*, 528 U. S., at 486. We have already ex-

---

[12] For example, researchers have found that over 90% of noncapital federal habeas petitioners proceed without counsel. See N. King et al., Final Technical Report: Habeas Litigation in U. S. District Courts 23 (2007).

plained why this would be "unfair" and ill advised. See *ibid.*; see also *Rodriquez*, 395 U. S., at 330. Compounding the trouble, defendants would be asked to make these showings in the face of the heightened standards and related hurdles that attend many postconviction proceedings. See, *e.g.,* 28 U. S. C. §§2254, 2255; see also Brief for Idaho Association of Criminal Defense Lawyers et al. as *Amici Curiae* 22–25.

The Government's proposal is also unworkable. For one, it would be difficult and time consuming for a postconviction court to determine—perhaps years later—what appellate claims a defendant was contemplating at the time of conviction.[13] Moreover, because most postconviction petitioners will be *pro se*, courts would regularly have to parse both (1) what claims a *pro se* defendant seeks to raise and (2) whether each plausibly invoked claim is subject to the defendant's appeal waiver (which can be complex, see *supra,* at 4–6), all without the assistance of counseled briefing. We are not persuaded that this would be a more efficient or trustworthy process than the one we reaffirm today.

The more administrable and workable rule, rather, is the one compelled by our precedent: When counsel's deficient performance forfeits an appeal that a defendant otherwise would have taken, the defendant gets a new opportunity to appeal. That is the rule already in use in 8 of the 10 Federal Circuits to have considered the question, see *supra,* at 3, and n. 3, and neither Idaho nor its *amici* have pointed us to any evidence that it has proved unmanageable there.[14] That rule does no more than restore

————————

[13] To the extent relief would turn on what precisely a defendant said to counsel regarding specific claims, moreover, Garza rightly points out the serious risk of "causing indigent defendants to forfeit their rights simply because they did not know what words to use." Reply Brief 17.

[14] It is, of course, inevitable that some defendants under this rule will seek to raise issues that are within the scope of their appeal waivers.

the status quo that existed before counsel's deficient performance forfeited the appeal, and it allows an appellate court to consider the appeal as that court otherwise would have done—on direct review, and assisted by counsel's briefing.

## IV

We hold today that the presumption of prejudice recognized in *Flores-Ortega* applies regardless of whether a defendant has signed an appeal waiver. This ruling follows squarely from *Flores-Ortega* and from the fact that even the broadest appeal waiver does not deprive a defendant of all appellate claims. Accordingly where, as here, an attorney performed deficiently in failing to file a notice of appeal despite the defendant's express instructions, prejudice is presumed "with no further showing from the defendant of the merits of his underlying claims." See *Flores-Ortega*, 528 U. S., at 484.

The judgment of the Supreme Court of Idaho is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

We are confident that courts can continue to deal efficiently with such cases via summary dispositions and the procedures outlined in *Anders*. See 386 U. S., at 744; n. 9, *supra*.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1026

_____

### GILBERTO GARZA, JR., PETITIONER *v.* IDAHO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF IDAHO

[February 27, 2019]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, and with whom JUSTICE ALITO joins as to Parts I and II, dissenting.

Petitioner Gilberto Garza avoided a potential life sentence by negotiating with the State of Idaho for reduced charges and a 10-year sentence. In exchange, Garza waived several constitutional and statutory rights, including "his right to appeal." App. to Pet. for Cert. 44a, 49a. Despite this express waiver, Garza asked his attorney to challenge on appeal the very sentence for which he had bargained. Garza's counsel quite reasonably declined to file an appeal for that purpose, recognizing that his client had waived this right and that filing an appeal would potentially jeopardize his plea bargain. Yet, the majority finds Garza's counsel constitutionally ineffective, holding that an attorney's performance is *per se* deficient and *per se* prejudicial any time the attorney declines a criminal defendant's request to appeal an issue that the defendant has waived. In effect, this results in a "defendant-always-wins" rule that has no basis in *Roe* v. *Flores-Ortega*, 528 U. S. 470 (2000), or our other ineffective-assistance precedents, and certainly no basis in the original meaning of the Sixth Amendment. I respectfully dissent.

## I

In 2015, in accordance with two plea agreements, Garza

entered an *Alford*[1] plea to aggravated assault and pleaded guilty to possession with intent to deliver methamphetamine. Under the terms of the plea agreements, Idaho agreed not to (1) file additional burglary and grand theft charges; (2) refer Garza for federal prosecution on a charge of unlawful possession of ammunition by a felon, see 18 U. S. C. §922(g)(1); or (3) seek a "Persistent violator" sentencing enhancement that would expose Garza to a potential life sentence, see Idaho Code Ann. §19–2514 (2017). In exchange, Garza agreed to "'waiv[e] his right to appeal'" and his right to file a motion for correction or reduction of his sentence.[2] *Ante,* at 2. And both parties agreed to specific sentences totaling 10 years of imprisonment, which would be binding on the District Court if it accepted the plea agreements. See Idaho Crim. Rules 11(f)(1)(C) and (f)(3) (2017) (allowing parties to agree to a binding sentence). Thus, the judge could impose no sentence other than the 10 years for which Garza had

---

[1] See *North Carolina* v. *Alford*, 400 U. S. 25, 37–38 (1970) (permitting courts to accept guilty pleas where defendants admit that there is a factual basis for the plea, but do not admit actual guilt).

[2] The majority questions the validity of Garza's appellate waivers by suggesting that "Garza may have been confused as to whether he had waived his appellate rights in the first place." *Ante,* at 2, n. 1. I read the record differently. It is true that, in the guilty form related to his possession charge, Garza checked "no" as to whether he was waiving his appeal rights. But, in the guilty form related to his aggravated-assault charge, he checked "yes" to waiving his appeal rights. And at the plea hearing for that offense, he acknowledged under oath that he understood all the questions, had received enough time with the guilty form, and answered each question honestly. He also acknowledged at the sentencing hearing for both offenses that he would be "go[ing] away for ten years," as negotiated for in the signed plea agreements that included the appeal waivers. Record 131. Finally, the trial court in postconviction proceedings concluded that Garza had never contended "at any stage of these post-conviction cases" that "he did not appreciate or understand the appeal waivers when he entered his pleas." *Id.,* at 185.

bargained.[3]

The trial court accepted the plea agreements and, as required, sentenced Garza to 10 years' imprisonment. However, the court noted that if the cases had been "considered individually," a "harsher sentence" might have been warranted due to Garza's "history of violent crime" and the "gratuitous aggression" displayed by Garza in the aggravated-assault case. Record 336.

Four months later, Garza filed the petitions for postconviction relief at issue here. Among other things, he claimed that his pleas were not voluntary and that his counsel had been constitutionally ineffective for failing to file an appeal despite repeated requests that he do so. For relief, Garza requested that his sentences "run concurrent." *Id.,* at 207. The trial court appointed counsel to pursue Garza's collateral challenges. It subsequently dismissed Garza's claim that his plea was involuntary for "lack of supporting evidence," but it allowed the ineffective-assistance claim to proceed. App. to Pet for Cert. 3a, 29a.

In response to Garza's ineffective-assistance claim, Idaho submitted an affidavit from Garza's trial counsel, which stated, "Garza indicated to me that he knew he agreed not to appeal his sentence(s) but he told me that he wanted to appeal the sentence(s)" anyway. Record 151. The trial counsel explained that he did not honor that request because "Garza received the sentence(s) he bargained for in his [Idaho Criminal Rule] 11(f)(1)(c) Agreement," and he told Garza "that an appeal was problematic because he waived his right to appeal in his Rule 11 agreements." *Ibid.* Garza, through his newly appointed

_____

[3] See *id.,* at 96, 108 ("I understand that my plea agreement is a binding plea agreement. This means that if the district court does not impose the specific sentence as recommended by both parties, I will be allowed to withdraw my plea of guilty pursuant to Rule 11(d)(4) of the Idaho Criminal Rules and proceed to a jury trial"); see also *id.,* at 128.

collateral counsel, admitted that the appeal waiver "was by the book," that he "received exactly what he bargained for in exchange for his plea," and that there was "no ambiguity" as to the appropriate sentence. *Id.,* at 161–162, 276–277. Garza also conceded that, if forced to identify an issue he would raise on appeal, "[t]he only issue that could be identified is sentencing review." *Id.,* at 176, 371.

The trial court granted summary judgment to Idaho. It explained that Garza needed to identify "non-frivolous grounds for contending on appeal either that (i) the appeal waiver is invalid or unenforceable, or (ii) the issues he wants to pursue on appeal are outside the waiver's scope." App. to Pet. for Cert. 38a. The Idaho Court of Appeals and the Idaho Supreme Court affirmed. Notably, the Idaho Supreme Court declined to presume negligent performance because state law imposes a duty on counsel not to file frivolous litigation and to avoid taking actions that will jeopardize the benefit his client gained from the plea bargain. The Idaho Supreme Court also found *Flores-Ortega* inapplicable, reasoning that once a defendant waives his appellate rights, he no longer has a right to an appellate proceeding at all.

## II

As with most ineffective-assistance claims, a defendant seeking to show that counsel was constitutionally ineffective for failing to file an appeal must show deficient performance and prejudice. *Strickland* v. *Washington*, 466 U. S. 668, 687 (1984). Relying on *Flores-Ortega*, the majority finds that Garza has satisfied both prongs. In so holding, it adopts a rule whereby a criminal defendant's invocation of the words "I want to appeal" can undo all sworn attestations to the contrary and resurrect waived statutory rights.

This rule is neither compelled by precedent nor consistent with the use of appeal waivers in plea bargaining.

In my view, a defendant who has executed an appeal waiver cannot show prejudice arising from his counsel's decision not to appeal unless he (1) identifies claims he would have pursued that were outside the appeal waiver; (2) shows that the plea was involuntary or unknowing; or (3) establishes that the government breached the plea agreement. Garza has not made any such showing, so he cannot establish prejudice. Furthermore, because Garza's counsel acted reasonably, Garza also cannot establish deficient performance. I would therefore affirm.

## A

The majority relies on *Flores-Ortega* to create its new rule, but if anything, that decision undermines the majority's *per se* approach. In *Flores-Ortega*, the defendant pleaded guilty to second-degree murder without waiving *any* of his appellate rights. 528 U. S., at 473–474. On federal collateral review, the defendant alleged that his counsel was ineffective for failing to file a notice of appeal after she promised to do so. *Id.*, at 474. The record contained conflicting evidence as to whether the defendant had communicated his desire to appeal, and the District Court concluded that he failed to carry his burden. *Id.,* at 475. The Ninth Circuit reversed, reasoning that "a habeas petitioner need only show that his counsel's failure to file a notice of appeal was without the petitioner's consent." *Id.,* at 475–476.

This Court reversed. We first concluded that the Ninth Circuit's rule "effectively impose[d] an obligation on counsel in all cases either (1) to file a notice of appeal, or (2) to discuss the possibility of an appeal with the defendant, ascertain his wishes, and act accordingly." *Id.,* at 478. We rejected "this *per se* rule as inconsistent with *Strickland*'s holding that 'the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.'" *Ibid.* (quoting 466 U. S., at 688). We also

faulted the Ninth Circuit for "fail[ing] to engage in the circumstance-specific reasonableness inquiry required by *Strickland.*" 528 U. S., at 478. We concluded that this failure "alone mandates vacatur and remand." *Ibid.*

We further explained that counsel's failure to consult with the client about an appeal constitutes deficient performance only when counsel *should* have consulted. *Id.*, at 479. The Court was clear: "We cannot say, as a *constitutional* matter, that in every case counsel's failure to consult with the defendant about an appeal is necessarily unreasonable." *Ibid.* In determining whether counsel has a duty to consult, we stated that "a highly relevant factor in this inquiry will be whether the conviction follows a trial or guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Id.*, at 480. Finally, "[e]ven in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Ibid.* We rejected the argument that choosing not to consult was outside the scope of valid, strategic decisionmaking, as "we have consistently declined to impose mechanical rules on counsel." *Id.*, at 481. In sum, we "reject[ed] a bright-line rule that counsel must always consult with the defendant regarding an appeal" and instructed courts to evaluate whether the decision to consult was "reasonable" under the circumstances. *Id.*, at 480–481.

We also rejected the Ninth Circuit's "*per se* prejudice rule" because it "ignore[d] the critical requirement that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal." *Id.,* at 484. We held that, "to show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probabil-

ity that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Ibid.* After the defendant makes that showing, we held that he was entitled to a presumption of prejudice because he was denied counsel during the entire appellate proceeding, rendering it presumptively unreliable. *Id.,* at 483–485.

The Court purports to follow *Flores-Ortega*, but glosses over the important factual and legal differences between that case and this one. The most obvious difference is also the most crucial: There was no appellate waiver in *Flores-Ortega*. The proximate cause of the defendant's failure to appeal in that case was his counsel's failure to file one. Not so here. Garza knowingly waived his appeal rights and never expressed a desire to withdraw his plea. It was thus Garza's agreement to waive his appeal rights, not his attorney's actions, that caused the forfeiture of his appeal. Thus, *Flores-Ortega* is inapposite.

## B

Because *Flores-Ortega* does not control cases involving defendants who voluntarily waive their appeal rights, this case should be resolved based on a straightforward application of *Strickland*. Under that framework, Garza has failed to demonstrate either (1) that his counsel was deficient or (2) that he was prejudiced in any way by that alleged deficiency.

## 1

As to deficiency, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel." *Strickland*, 466 U. S., at 688–689. Accordingly, "[j]udicial scrutiny of counsel's performance must be highly deferential" and focus on "the reasonableness of counsel's challenged conduct on the facts of the particular case." *Id.,* at 689–

690.

Counsel's choice not to appeal Garza's sentence—the only issue Garza asked his counsel to challenge—was not only not deficient, it was the only professionally reasonable course of action for counsel under the circumstances. That is because filing an appeal would have been worse than pointless even judging by Garza's own express desires; it would have created serious risks for Garza while having no chance at all of achieving Garza's stated goals for an appeal. Garza had pleaded guilty under Rule 11, expressly waived his right to appeal his sentence, and stated that his desire in appealing was to have his consecutive sentences "r[u]n concurrent." Record 207. But that kind of appeal challenges the defining feature of a Rule 11 plea: the agreed-upon sentence from which the trial court has no discretion to deviate. Here, that sentence includes the consecutive sentences that Garza agreed to, then sought to challenge. Had Garza's counsel reflexively filed an appeal and triggered resentencing, Garza might have faced life in prison, especially in light of the trial court's concern that the agreed-upon sentence (from which it could not deviate under Rule 11) might have been too lenient. And Garza's admissions at the plea hearings and his written plea form could have been (and thus likely *would* have been) used against him if he had proceeded to trial on any additional charges filed by the State after breaching the plea agreements. See *id.,* at 104 ("[S]hould the court reinstate a plea of not guilty on his behalf, the State will use Defendant's testimony during his entry of plea of guilty and his written plea form, during the State's case at trial"); *id.,* at 92 (same).

Under these circumstances, it is eminently reasonable for an attorney to "respec[t] his client's formal waiver of appeal" and uphold his duty "to avoid taking steps that will cost the client the benefit of the plea bargain." *Nunez* v. *United States,* 546 F. 3d 450, 453, 455 (CA7 2008)

(Easterbrook, C. J.). And because filing an appeal places the defendant's plea agreement in jeopardy, an attorney's decision not to file in the face of an appellate waiver does not amount to the failure to perform "a purely ministerial task" that "cannot be considered a strategic decision." *Flores-Ortega*, 528 U. S*.,* at 477. Even where state law or a plea agreement preserves limited appeal rights, an attorney does not fail to "show up for appeal" by declining to challenge a waived issue. *Nunez, supra*, at 454.

The deficiency analysis in this case would likely be different if Garza had informed his counsel that he desired to breach the plea agreements and file an appeal—despite the waiver and in full awareness of the associated risks— for the sake of an identified goal that had any hope of being advanced by the filing of an appeal. But the record shows that Garza simply sought a more lenient sentence. Since that goal could not be advanced by an appeal in this case, counsel had no duty to file one. The Constitution does not compel attorneys to take irrational means to their client's stated ends when doing so only courts disaster.

Garza ultimately faults his plea-stage attorney for failing to put his plea agreements in jeopardy. But I have no doubt that if a similarly situated attorney breached a plea agreement by appealing a waived issue and subjected his client to an increased prison term, that defendant would argue that his counsel was ineffective for filing the appeal. What Garza wants—and what the majority gives him—is a *per se* deficiency rule ensuring that criminal defendants can always blame their plea-stage counsel on collateral review, even where they did not ask counsel to appeal nonwaived claims or breach the plea agreement for the sake of some further (achievable) goal. Declining to file an appeal under these circumstances is reasonable, not deficient.

2

As for prejudice, Garza cannot benefit from a presumed-prejudice finding since he cannot establish that his counsel caused the forfeiture of his appeal, as *Flores-Ortega* requires. Garza knowingly and voluntarily bargained away his right to appeal in exchange for a lower sentence. If any prejudice resulted from that decision, it cannot be attributed to his counsel.

It does not matter that certain appellate issues—specifically, (1) the voluntariness of the plea agreement and (2) a breach of the agreement by the State—are not waivable. Garza did not ask his counsel to appeal those issues. In fact, Garza has not identified any nonwaived issue that he would have brought on direct appeal; he simply identified "sentencing review" as his primary objective. Moreover, declining to file an appeal raising these nonwaivable claims is unlikely to be prejudicial; this Court has repeatedly stated that collateral review is a better avenue to address involuntariness and ineffective-assistance claims, as these claims often require extra-record materials and present conflicts with counsel. See generally *Massaro* v. *United States*, 538 U. S. 500 (2003).

The Court's decision in *McCoy* v. *Louisiana*, 584 U. S. ___ (2018), does not change the analysis. *McCoy* acknowledges that some decisions are "reserved for the client," including the decision whether to "forgo an appeal." *Id.,* at ___ (slip op., at 6). But Garza exercised his right to decide whether to appeal. He chose not to when he entered the plea agreements. Like many constitutional and statutory rights, the right to appeal can be waived by the defendant, and once that choice is finally made, the defendant is bound by the decision and cannot fault his attorney for the self-inflicted prejudicial effects that he suffers. For instance, a defendant cannot waive his right against self-incrimination by testifying at his trial, and then claim that his attorney prejudiced him by not moving to strike

his damaging testimony from the record. Nor can a defendant waive his right to a jury trial, and then later claim prejudice when his attorney declines to seek a mistrial on the ground that the judge found him guilty. In the same way, Garza was not prejudiced by his attorney's refusal to file an appeal challenging his sentence, a right that he had expressly waived. The lack of prejudice is especially pronounced in this case, as Garza's instruction to appeal did not acknowledge that he wanted to challenge or rescind the plea agreements.

C

There is no persuasive reason to depart from an ordinary *Strickland* analysis in cases involving an attorney's decision to honor his client's agreement to waive his appeal rights. Garza contends that it is unfair to require *pro se* defendants to identify the issues they would have raised on appeal. But *pro se* defendants always bear the burden of showing ineffective assistance of counsel; I see no reason why this kind of ineffective-assistance claim should be any different. Regardless, Garza's fairness argument rings hollow because Garza has been represented by counsel at every stage of this collateral litigation and has yet to articulate a single nonfrivolous, nonwaived issue that he would have raised on appeal. His inability to identify any issues that he preserved simply underscores the fact that he waived them all.

The Court's rule may be easy to "administ[er]," *ante*, at 13, but it undermines the finality of criminal judgments—a primary purpose of plea agreements—and disadvantages the public by allowing defendants to relitigate issues that they waived in exchange for substantial benefits. The Court's rule also burdens the appellate courts that must address the new, meritless appeals authorized by today's decision. And, ironically, the Court's rule may prejudice the defendants it is designed to help, as prosecutors may

understandably be less willing to offer generous plea agreements when courts refuse to afford the government the benefit of *its* bargain—fewer resources spent defending appeals.

Finally, because Garza's requested relief is categorically barred by the plea agreements, the majority offers Garza an appeal he is certain to lose. And should Garza accept the majority's invitation, he could give up much more. If Garza appeals his sentence and thereby breaches his plea agreements, Idaho will be free to file additional charges against him, argue for a "Persistent violator" sentencing enhancement that could land him in prison for life, and refer him for federal prosecution. It simply defies logic to describe counsel's attempt to avoid those consequences as deficient or prejudicial.

## III

In addition to breaking from this Court's precedent, today's decision moves the Court another step further from the original meaning of the Sixth Amendment. The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." That provision "as originally understood and ratified meant only that a defendant had a right to employ counsel, or to use volunteered services of counsel." *Padilla* v. *Kentucky,* 559 U. S. 356, 389 (2010) (Scalia, J., dissenting). Yet, the Court has read the Constitution to require not only a right to counsel at taxpayers' expense, but a right to *effective* counsel. The result is that convicted criminals can relitigate their trial and appellate claims through collateral challenges couched as ineffective-assistance-of-counsel claims. Because little available evidence suggests that this reading is correct as an original matter, the Court should tread carefully before extending our precedents in this area.

A

The Sixth Amendment right to the assistance of counsel grew out of the Founders' reaction to the English common-law rule that denied counsel for treason and felony offenses with respect to issues of fact, while allowing counsel for misdemeanors. See 4 W. Blackstone, Commentaries on the Laws of England 349–350 (1769); 1 J. Stephen, A History of the Criminal Law of England 341 (1883); *Powell* v. *Alabama*, 287 U. S. 45, 60 (1932) ("Originally, in England, a person charged with treason or felony was denied the aid of counsel, except in respect of legal questions which the accused himself might suggest"). It was not until 1696 that England created a narrow exception to this rule for individuals accused of treason or misprision of treason—by statute, Parliament provided both that the accused may retain counsel and that the court must appoint counsel if requested. 7 & 8 Will. 3, ch. 3, §1. Only in 1836 did England permit all criminally accused to appear and defend with counsel, and even then it did not require court-appointed counsel at government expense. 6 & 7 Will. 4, ch. 114, §1. It would be another 67 years—112 years after the ratification of the Sixth Amendment, and 35 years after the ratification of the Fourteenth Amendment—before England provided court-appointed counsel for all felonies. Poor Prisoners' Defence Act, 1903, 3 Edw. 7, ch. 38, §1.

The traditional common-law rule that there was no right to assistance of counsel for felony offenses received widespread criticism. As Blackstone noted, this rule "seems to be not at all of a piece with the rest of the humane treatment of prisoners by the English law." 4 Blackstone, Commentaries on the Laws of England, at 349; see *ibid.* ("[U]pon what face of reason can that assistance be denied to save the life of a man, which yet is allowed him in prosecutions for every petty trespass"). The founding generation apparently shared this senti-

ment, as most States adopted some kind of statutory or
constitutional provision providing the accused the right to
retain counsel. W. Beaney, The Right to Counsel in Amer-
ican Courts 14–22 (1955). In fact, at least 12 of the 13
States at the ratification of the Constitution had rejected
the English common-law rule, providing for the right to
counsel in at least some circumstances. See *Powell*, 287
U. S., at 64–65; *id.,* at 61–64 (surveying the States' right-
to-counsel provisions); see also *Betts* v. *Brady*, 316 U. S.
455, 465–467 (1942) (discussing early state constitutional
provisions), overruled by *Gideon* v. *Wainwright*, 372 U. S.
335 (1963). Read against this backdrop, the Sixth
Amendment appears to have been understood at the time
of ratification as a rejection of the English common-law
rule that prohibited counsel, not as a guarantee of
government-funded counsel.

This understanding—that the Sixth Amendment did not
require appointed counsel for defendants—persisted in the
Court's jurisprudence for nearly 150 years. See *United
States* v. *Van Duzee*, 140 U. S. 169, 173 (1891) ("There is,
however, no general obligation on the part of the govern-
ment [to] retain counsel for defendants or prisoners"); *Bute*
v. *Illinois*, 333 U. S. 640, 661, n. 17 (1948) ("It is probably
safe to say that from its adoption in 1791 until 1938, the
right conferred on the accused by the Sixth Amendment
. . . was not regarded as imposing on the trial judge in a
Federal court the duty to appoint counsel for an indigent
defendant"). Nor evidently was there any suggestion that
defendants could mount a constitutional attack based on
their counsel's failure to render effective assistance.[4]

—————

[4] A defendant could bring a state-law tort action against his attorney.
As one commentator explained:

"An attorney is bound to exercise such skill, care and diligence in any
matter entrusted to him, as members of the legal profession commonly
possess and exercise in such matters. . . . He will be liable if his client's
interests suffer on account of his failure to understand and apply those

The Court began shifting direction in 1932, when it suggested that a right to appointed counsel might exist in at least some capital cases, albeit as a right guaranteed by the Due Process Clause. *Powell*, *supra*, at 71. Soon thereafter, the Court held that the Sixth Amendment secures a right to court-appointed counsel in all federal criminal cases. *Johnson* v. *Zerbst*, 304 U. S. 458, 462–463 (1938). And in 1963, the Court applied this categorical rule to the States through the Fourteenth Amendment, stating "that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." *Gideon*, *supra,* at 344. Neither of these opinions attempted to square the expansive rights they recognized with the original meaning of the "right . . . to have the Assistance of Counsel." Amdt. 6.

B

After the Court announced a constitutional right to appointed counsel rooted in the Sixth Amendment, it went on to fashion a constitutional new-trial remedy for cases in which counsel performed poorly. The Courts of Appeals had initially adopted a "farce and mockery" standard that they rooted in the Due Process Clause. This standard permitted a defendant to make out an ineffective-assistance claim only "where the circumstances surrounding the trial shocked the conscience of the court and made the proceedings a farce and a mockery of justice." *Diggs* v.

––––––––

rules and principles of law that are well established and clearly defined in the elementary books, or which have been declared in adjudged cases that have been duly reported and published a sufficient length of time to have become known to those who exercise reasonable diligence in keeping pace with the literature of the profession." T. Cooley, Law of Torts \*779 (footnotes omitted).

Thus, reasonable choices not clearly foreclosed by law or precedent would apparently permit an attorney to successfully defend against the suit.

*Welch*, 148 F. 2d 667, 670 (CADC 1945); see *Bottiglio* v. *United States*, 431 F. 2d 930, 931 (CA1 1970) (*per curiam*); *Williams* v. *Beto*, 354 F. 2d 698, 704 (CA5 1965); *Frand* v. *United States*, 301 F. 2d 102, 103 (CA10 1962); *O'Malley* v. *United States*, 285 F. 2d 733, 734 (CA6 1961); *Snead* v. *Smyth*, 273 F. 2d 838, 842 (CA4 1959); *Cofield* v. *United States*, 263 F. 2d 686, 689 (CA9), vacated on other grounds, 360 U. S. 472 (1959); *Johnston* v. *United States*, 254 F. 2d 239, 240 (CA8 1958); *United States ex rel. Feeley* v. *Ragen*, 166 F. 2d 976, 980–981 (CA7 1948); *United States* v. *Wight*, 176 F. 2d 376, 379 (CA2 1949).

Beginning in 1970, the Courts of Appeals moved from the "farce and mockery" standard to a "reasonable competence" standard. See *Trapnell* v. *United States*, 725 F. 2d 149, 151–152 (CA2 1983) (collecting cases). That same year, this Court similarly held that defendants are "entitled to the effective assistance of competent counsel," defined as receipt of legal advice that is "within the range of competence demanded of attorneys in criminal cases." *McMann* v. *Richardson*, 397 U. S. 759, 771 (1970).

Then, in *Strickland*, the Court crafted the current standard for evaluating claims of ineffective assistance of counsel. Without discussing the original meaning of the Sixth Amendment, the Court stated that "[t]he Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." 466 U. S*.,* at 685. The Court thus held that, to succeed on an ineffective-assistance claim, the defendant must show (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 688, 694. The Court applies this standard in most situations, but, as it does today, it has also created an increasing number of *per se* rules in

lieu of applying *Strickland*'s fact-specific inquiry, thereby departing even further from the original meaning of the Sixth Amendment.

There are a few problems with these precedents that should cause us to pause before extending them. First, the ineffective-assistance standard apparently originated not in the Sixth Amendment, but in our Due Process Clause jurisprudence. See *McMann*, *supra*, at 771, n. 14. Second, "[t]he Constitution, by its terms, does not mandate any particular remedy for violations of its own provisions." *United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 157 (2006) (ALITO, J., dissenting); cf. *Collins* v. *Virginia*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (THOMAS, J., concurring) (slip op., at 2–5) (explaining that the exclusionary rule is not required by the Fourth Amendment). *Strickland* does not explain how the Constitution requires a new trial for violations of any right to counsel.

Third, our precedents seek to use the Sixth Amendment right to counsel to achieve an end it is not designed to guarantee. The right to counsel is not an assurance of an error-free trial or even a reliable result. It ensures fairness in a single respect: permitting the accused to employ the services of an attorney. The structural protections provided in the Sixth Amendment certainly seek to promote reliable criminal proceedings, but there is no substantive right to a particular level of reliability. In assuming otherwise, our ever-growing right-to-counsel precedents directly conflict with the government's legitimate interest in the finality of criminal judgments. I would proceed with far more caution than the Court has traditionally demonstrated in this area.

C

The Court should hesitate before further extending our precedents and imposing additional costs on the taxpayers

and the Judiciary.[5]  History proves that the States and the
Federal Government are capable of making the policy
determinations necessary to assign public resources for
appointed counsel.  The Court has acknowledged as much.
*Betts*, 316 U. S., at 471 (declining to extend the right to
counsel to the States because "the matter has generally
been deemed one of legislative policy").  Before the Court
decided *Gideon*, the Court noted that "most of the States
have by legislation authorized or even required the courts
to assign counsel for the defense of indigent and unrepre-
sented prisoners.  As to capital cases, all the States so
provide.  Thirty-four States so provide for felonies and 28
for misdemeanors." *Bute*, 333 U. S., at 663 (internal quo-
tation marks omitted).  It is beyond our constitutionally
prescribed role to make these policy choices ourselves.
Even if we adhere to this line of precedents, our dubious
authority in this area should give us pause before we
extend these precedents further.

——————

    [5] In 2018, the Federal Government's budget for defense counsel had
grown to more than $1 billion.  See Consolidated Appropriations Act,
2018, Pub. L. 115–141, Div. E, Tit. III, 132 Stat. 348.  And the collateral
challenges produced by the Court's right-to-counsel jurisprudence
consume much of the federal courts' resources.    Cf. Statistical
Tables for the Federal Judiciary—June 2018, Table B–7 (for 12-month
period ending June 30, 2018, roughly 24% of appeals filed in the courts
of appeals—8,914 of 37,487—were categorized as "Habeas Corpus" or
"Motions to Vacate Sentence") https://www.uscourts.gov/statistics-
reports/statistical-tables-federal-judiciary-june-2018 (as last visited
Feb. 25, 2019); *id.*, Table C–2 (22,478 of 281,202 cases filed in federal
district court, or roughly 8%).